UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

| | |
|---|---|
| **DEANNA DOBSON,** | **CIVIL ACTION NO. 5:22-CV-210-KKC** |
| **Plaintiff,** | |
| V. | **OPINION AND ORDER** |
| **MID-AMERICA CONVERSION SERVICES, LLC,** | |
| **Defendant.** | |

*** *** ***

The matter is before the Court on plaintiff Deanna Dobson's motion for partial summary judgment (DE 37) and defendant Mid-America Conversion Services, LLC's motion for summary judgment (DE 39).

I.  Background

Mid-America Conversion Services, LLC ("MCS") is the current holder of a federal government contract with the Department of Energy. MCS's main responsibility under the contract is to safely store and convert certain chemical byproducts into more stable forms. MCS was awarded this contract in 2017. It thereafter hired Deanna Dobson as a "Programmer Analyst – Lead" in the company's IT Department. Dobson had worked for the company that held the contract with the DOE prior to MCS acquiring that same contract.

With MCS, Dobson performed typical IT functions and supervised the team of five to six employees within her department. Prior to the onset of the infamous COVID-19 pandemic, Dobson and her team worked onsite in MCS's office in Lexington, Kentucky.

In March 2020, the DOE instructed MCS to curtail its operation. Many employees were placed on leave. But office support employees, like Dobson, continued to work and were

1

instructed to work remotely. Remote work became the status quo at MCS for more than a year. Dobson claims that she performed her job duties without issue during this period.

The status quo began to change in September of 2021. On September 9th, President Biden issued an executive order requiring covered federal contractors to ensure workers were fully vaccinated. On September 24th, the "Safer Federal Workforce Task Force" issued guidance that set a vaccination deadline of December 8th for on-cite workers. On October 6th, the DOE informed MCS that it would be requiring MCS to comply with the guidance issued by the Task Force. Approximately one week later, MCS announced to all employees that it was requiring employees to be fully vaccinated by December 1, 2021, or otherwise submit an exemption request.

On October 18th, Dobson submitted an exemption request based on (1) her medical condition and (2) her religious objection to the COVID-19 vaccination. Dobson proposed that she be allowed to stay unvaccinated, continue remote work, and take tests, socially distance, and wear a mask if she were ever required to physically come into the office.

Dobson's medical exemption was premised on two autoimmune diseases she was diagnosed with: psoriasis and psoriatic arthritis. According to Dobson, the CDC's website said that people with autoimmune diseases should not receive the vaccination. On this warning, Dobson consulted with medical professionals. First, Dobson emailed her primary care doctor, Dr. Nicci Pittman. Dr. Pittman recommended that Dobson receive the vaccination. Next, Dobson visited Dr. Joseph Fitzgerald in Largo, Florida. After meeting with Dobson, Dr. Fitzgerald agreed to fill out a medical exemption form recommending that vaccination was contraindicated for Dobson considering her autoimmune diseases. Dobson later testified that her psoriasis affects her by causing itching and skin problems and that her psoriatic arthritis affects her ability to walk.

2

Dobson's religious exemption request was premised on her Catholic faith. Dobson claimed that she read that researchers used "aborted fetal cell tissues" during the testing phases of developing the COVID-19 vaccinations. In Dobson's eyes, this fact created a conflict between her religious-based views on abortion and the vaccinations.

Sometime thereafter, MCS created an "Accommodations Review Committee" following an influx of exemption requests. On October 21st, the Committee determined that it could not provide Dobson with an accommodation and therefore rejected her exemption request. The Committee found itself unable to grant Dobson an accommodation in large part because it determined that 40% of her job duties required in-person work. Thus, the Committee informed Dobson that she would be required to be fully vaccinated by December 1st or be terminated. Dobson remained unvaccinated and was terminated on November 30th.

Certain post-termination facts are relevant here. First is the sworn testimony of Michelle Sexton, an Executive Assistant to MCS's COO, Scott Nicholson.[1] Sexton claims to have attended and produced the minutes for the Committee's meetings wherein it discussed all exemption requests submitted to MCS. Sexton claims that Nicholson stated outright at those meetings, without any individualized consideration, that MCS would not be grant any exemption requests. Relevant also is what Dobson claims happened to her position after she was terminated. Dobson alleges that after having been denied an accommodation permitting her to continue remote work, her job was posted online as being 100% remote work. Further, Dobson claims that her former position is being performed 100% remotely to this day.

Based on the foregoing, Dobson initiated this lawsuit against MCS. Dobson alleges violations of the Americans with Disabilities Act, Title VII, and the Kentucky Civil Rights Act.

---

[1] Nicholson also served as MCS's Deputy Project Manager, Chief Engineer, CAO, and its ESH&QA Director.

3

**II.    Standard of Review**

A district court will grant summary judgment when the moving party shows there is no genuine dispute regarding any material fact and that the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party carries this burden, the burden of production shifts to the nonmoving party to "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case. *Celotex*, 477 U.S. at 322.

At the summary judgment stage, the Court does not to weigh the evidence and determine the truth of the matter. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Further, the Court is not to judge the evidence or make findings of fact. *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435-36 (6th Cir. 1987). Rather, this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251-52.

**III.    Analysis**

At the outset, the Court will explain its construction of the counts in Dobson's complaint. Count I is titled "Disability Discrimination and Failure to Accommodate." Dobson then cites both the ADA and the Kentucky Act as statutory bases for relief. In her motion for summary judgment, Dobson's sole theory of disability discrimination is that MCS failed to reasonably accommodate her condition. This renders Dobson's discrimination claim indistinguishable from her accommodation claim. The Court therefore reads Count I as only asserting a failure to accommodate claim. Count II is similar. It is titled "Religious Discrimination and Failure to Accommodate Sincerely Held Religious Belief." In her motion

4

for summary judgment, failure to accommodate is the only theory of religious discrimination Dobson alleges. Thus, just like Count I, the religious discrimination claim is indistinguishable from the failure to accommodate claim. The Court therefore reads Count II as only asserting a failure to accommodate claim. Finally, Count III is a straightforward retaliation claim premised on Dobson's request for an accommodation—an activity she claims constitutes "protected activity" under the ADA, Title VII, and the Kentucky Act.

### a. Failure to Accommodate Disability

Both parties move for summary judgment on Count I of Dobson's complaint. As described above, the Court construes Count I to allege disability discrimination on a failure to accommodate theory.

As an initial matter, the parties dispute what analysis applies to a failure to accommodate theory under the ADA and the Kentucky Act. The Sixth Circuit applies a direct evidence analysis, rather than the *McDonnell Douglas* framework, when a disability discrimination claim brought under the ADA is premised on failure to accommodate. *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1228 (6th Cir. 2022). A direct evidence analysis applies under the Kentucky Act as well because the Kentucky Act is interpreted consistent with federal law. *Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 526 (6th Cir. 2015). Operating under the direct evidence analysis, a plaintiff "bears the initial burden of establishing that (1) she is disabled, [and that] (2) she is otherwise qualified for the position despite his or her disability." *Id*. MCS argues both that Dobson cannot satisfy either prong.

### i. Whether Dobson is "disabled" under the ADA or the Kentucky Act.

First, MCS argues that Dobson is not disabled as defined by the ADA or the Kentucky Act. Although usually interpreted in lockstep, the ADA applies a broader disability definition than does the Kentucky Act. *See, e.g., Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F.

5

Supp. 2d 653, 658, n.2 (W.D. Ky. 2012). For the following reasons, the Court finds that Dobson may be able to satisfy the ADA's more lenient definition of "disabled" but not the Kentucky Act's stricter definition.

Based on her pleadings, Dobson seems to only claim she is "actually disabled." To prove that she is "actually disabled" under either the Kentucky Act or the ADA, Dobson must demonstrate "(1) a physical or mental impairment that (2) substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "Major life activities" under both acts include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending . . ., and working." *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 299 (6th Cir. 2019) (quoting 42 U.S.C. § 12102(2)(A)). The ADA and Kentucky Act diverge, however, in one respect relevant to this case: what constitutes a "substantial" impairment. Under the ADA, an "impairment need not prevent, or significantly or severely restrict a major life activity to be substantially limiting." *Harrison v. Soave Enter. L.L.C.*, 826 F. App'x 517, 523 (6th Cir. 2020). This standard is to be construed liberally. *Id*. In contrast, under the Kentucky Act, "[a]n impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation." *Bryson v. Regis Corp.*, 498 F.3d 561, 576 (6th Cir. 2007) (citation omitted).

Here, Dobson's failure to accommodate claim is predicated on her psoriasis and psoriatic arthritis, both of which are autoimmune diseases. These conditions certainly constitute "physical impairments" under either the ADA or the Kentucky Act. Further, Dobson alleges that her psoriatic arthritis limits her ability to walk. (DE 43 at Page ID# 718.) Dobson testified that "[s]ome days I can't walk very well," and that she has "problems walking." (DE 43 665, 718.) On this testimony, Dobson has certainly alleged that her psoriatic arthritis affects a major life activity—walking—under both the ADA and the Kentucky Act. The remaining issue is whether Dobson's ability to walk is "substantially" impaired.

Under the ADA, the Court finds a genuine dispute of fact exists as to whether Dobson suffered from an impairment that substantially limited her ability to walk. This is because the ADA's disability definition is "to be construed broadly in favor of expansive coverage," *Harrison*, 826 F.App'x at 523, and Dobson's testimony could indicate to a reasonable jury that her limitation was substantial.

Under the Kentucky Act, however, Dobson has failed to demonstrate how a major life activity—walking—is substantially limited by her condition. S*ee e.g., Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 825 (S.D. Ohio 2004) (applying pre-2008 ADA definition of disability, like the Kentucky Act, the court noted that "mere difficulty in standing or walking is not sufficient to establish a substantial limitation."). Dobson's testimony is devoid of any mention regarding the severity or consistency in which her ability to walk is limited. And Dobson provides no objective medical records to make up for this deficiency. Thus, as a matter of law, Dobson is not able to establish her prima facie case for failure to accommodate a disability claim under the Kentucky Act.

To summarize, the foregoing entitles MCS to summary judgment on the state law component of Count I but not the federal law component. Thus, Dobson's ADA claim survives.

### ii. Whether Dobson is "otherwise qualified" under the ADA.

Second, MCS argues Dobson is not "otherwise qualified" under the ADA. Dobson can carry her burden to prove that she was "otherwise qualified" by showing that she could perform the essential functions of her job, despite her disability, either (1) without accommodation(s), (2) "with an alleged 'essential' job requirement eliminated," or (3) with a reasonable accommodation. *Blanchet*, 27 F.4th at 1228. Dobson does not argue that she was "otherwise qualified" for her position "without accommodations." Rather, Dobson and MCS dispute whether Dobson was "otherwise qualified" for her position "with an 'essential' job requirement removed" or "with a reasonable accommodation." When proceeding under either

7

of these two modes of proof, the Sixth Circuit applies a burden shifting regimen. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996).

First, if a plaintiff claims they were "otherwise qualified" for their position "with an 'essential' job requirement removed," the burden shifts to the defendant employer to prove the challenged job criterion was "essential, and therefore a business necessity." *Monette*, 90 F.3d at 1186. "Essential functions generally are those that the employer's 'judgment' and 'written [job] description' prior to litigation deem essential." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761-62 (6th Cir. 2015). This general rule does not give employers a blank check. Rather, "a genuine fact issue might exist as to whether [an alleged job requirement] is *actually* essential—[if] it is contradicted by materially similar job practices." *Id.* at 765.

Here, Dobson claims that she was fully qualified for her position if the "essential" job requirement of in-person attendance was removed. (DE 55 at 17-19.) In response, MCS argues that in-person attendance was an essential job function for Dobson's position. (DE 59 at 4-6.) MCS cites to various Sixth Circuit caselaw to suggest that "regular, in-person attendance is an essential function," of essentially all jobs. (*Id.* at 20.) In this case, however, MCS's argument is undermined by the facts. MCS argues that leading up to Dobson's termination, it "determined that at least 40% of [Dobson's] essential management duties required she be in the Lexington office so that she could interact with the employees she supervised." (*Id.* at 5.) Dobson alleges, however, that she had been completing her job via telework without issue for nineteen months preceding MCS's vaccine policy. (DE 55 at 1.) What is more, Dobson claims that after she was terminated, her very job position "was posted as being 100% remote work." (*Id.* at 2.) On these facts, there is a genuine dispute of fact because MCS's claim that in-person attendance is an essential job function is "contradicted

8

by materially similar job practices." *Ford Motor*, 782 F.3d at 761-62. Accordingly, under this method of proof, neither party is entitled to summary judgment as to Count I.

Next, Dobson argues that she was "otherwise qualified" for her position if she had been provided with the accommodation she proposed. (DE 55 at 18.) Proceeding under this mode of proof, Dobson carries the initial burden to prove that her proposed accommodation was objectively reasonable. *Monette*, 90 F.3d at 1183. To carry her burden, Dobson "must merely suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Cehrs v. Ne. Ohio Alzheimer's Rsch. Ctr.*, 155 F.3d 775 (6th Cir. 1998) (citation omitted). If Dobson satisfies her burden, the burden shifts to MCS to prove the proposed accommodation would have imposed an undue hardship. *Id*.

Here, Dobson's proposed accommodation consisted of the following: (1) to continue remote work; (2) to allow her to remain unvaccinated; and (3) to take COVID-19 tests, at her own cost, socially distance, and wear a mask if her in-person attendance was ever required. (DE 37 at 4.) The Court finds a genuine dispute of fact exists as to whether Dobson's proposed accommodation was objectively reasonable. On one hand, MCS provided testimony that in-person attendance was an essential job function. (DE 59 at 5.) And "[a] proposed accommodation is not reasonable if it removes an essential function from an employee's role." *McKinney v. Macomb Cnty., Michigan*, No. 23-1625, 2024 WL 2312574, at *4 (6th Cir. May 22, 2024). On the other hand, Dobson argues that she had already performed her job remotely "without any problem," for eighteen months preceding her termination. (DE 43 at Page ID# 711.) This evidence is sufficient to create a genuine disagreement as to whether Dobson's proposed accommodation was "plausible." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 856 (6th Cir. 2018) (finding summary judgment was precluded where evidence was produced that showed the plaintiff "could complete all of her essential functions working remotely.").

Alternatively, MCS argues that Dobson was not "otherwise qualified" because she was as a "direct-threat." (DE 42 at 21.) This "direct-threat" argument is an affirmative defense which MCS carries the burden to prove. *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 12 (6th Cir. 2012). To determine whether Dobson was a "direct-threat," the Court looks to four factors: "(i) the duration of the risk, (ii) the nature and severity of the potential harm, (iii) the likelihood that the potential harm will occur, and (iv) the imminence of the potential harm." *Id*. For the first factor, "a speculative or remote risk is insufficient." *Id*. (citation omitted).

Here, MCS's argument does not address the factors set out in *Wurzel*. Rather, MCS very generally argues that Dobson, an unvaccinated individual, posed a direct-threat to MCS's workplace because of increased cases of COVID-19 nationwide at the time it implemented its vaccination policy. (DE 42 at 21-22.) Dobson, however, claims that she posed no threat to others. Dobson argues that if she were required to present in-person to work, she would test herself, wear a mask, and socially distance from others. (DE 55 at 21.) On these facts, the Court cannot say that Dobson was a direct-threat as a matter of law. MCS's fears regarding the danger Dobson presented are the sort of concerns that may be too speculative to have constituted a direct-threat. As such, the facts presented create a sufficient disagreement to warrant submission of this issue to a jury.

Finally, MCS argues that even if Dobson can make out her prima facie case, it can show her proposed accommodation imposed an undue hardship. (DE 42 at 24.) At this stage of the analysis, MCS carries the burden of persuasion to prove undue hardship. *Monette*, 90 F.3d at 1183. The Court looks to whether MCS has presented the Court with evidence that Dobson's proposal would impose "significant difficulty or expense" considering the following factors: (1) the nature and cost of the accommodation needed; (2) the overall financial resources of the facility involved in providing the reasonable accommodation; (3) the overall

financial resources of the employer; and (4) the type of operation of the employer. 29 C.F.R. § 1630.2(p).

Here, MCS argues Dobson's proposed accommodation would have imposed substantial, financial costs. (DE 42 at 23-26.) For the first factor, MCS argues that if it allowed Dobson to continue remote work, it would have incurred the following costs: $55,279.64 annually in testing costs; $14,000 to retrofit and sanitize MCS's workspaces; $8,826.98 to train someone to perform Dobson's in-office duties; and $3,000 per week to hire a temporary employee to perform Dobson's in-office duties. (*Id.* at 25.) The factual bases for MCS's arguments, however, are disputed by facts Dobson has put before the Court. In her response, Dobson points out that her replacement has continued to perform her previous job fully remotely. (DE 55 at 23.) Thus, Dobson argues that the costs associated with allowing her position to be completed remotely cannot impose an "undue hardship" if MCS continues to allow such remote work. (*Id.*) Additionally, through the testimony of Michelle Sexton, Dobson has produced evidence that MCS's arguments regarding its anticipated financial costs of accommodating Dobson are all pretextual. (DE 37 at 5-6.) MCS makes additional arguments regarding the remaining factors enumerated in § 1630.2(p). (DE 42 at 25.) But those arguments are rebutted by the same evidence Dobson has presented to counter MCS's argument as to the first factor. Thus, a significant factual dispute exists as to the issue of undue hardship. Accordingly, neither MCS nor Dobson have shown that they are entitled to judgment as a matter of law on the basis of the "undue hardship" component of the analysis.

In summation, MCS is entitled to summary judgment on Dobson's claim brought under the Kentucky Act included in Count I. However, neither party has shown that the evidence is so one sided as to entitle them to summary judgment on Dobson's ADA claim included in Count I.

### b. Failure to Accommodate Religion

Both parties move for summary judgment on Count II as well. Again, as described above, the Court construes the religious discrimination and failure to accommodate claims to be indistinguishable. The claims are indistinguishable, in part, because the analysis for any religious accommodation claim "begins with the question of whether the employee has established a prima facie case of religious discrimination." *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987). Dobson can establish her prima facie case by showing that: (1) she "holds a sincere religious belief that conflicts with an employment requirement," (2) she "informed the employer about," her conflict, and (3) she "was discharged or disciplined for failing to comply with the conflicting employment requirement." *Id.* If Dobson establishes her prima facie case, the burden shifts to MCS "to prove that it cannot reasonably accommodate [Dobson] without incurring undue hardship." *Id.*

### i. Whether Dobson holds a sincere religious belief.

As to Dobson's prima facie case, MCS seems to only challenge her ability to establish the first element. Title VII and the Kentucky Act protects "practices rooted in religious principle," but does not protect "purely secular beliefs." *DeVore v. Univ. of Kentucky Bd. of Trustees*, No. 23-5890, 2024 WL 4471281, at *4 (6th Cir. Oct. 11, 2024) (citations omitted). A court's analysis of an asserted belief "is agnostic to the reasonableness," of that belief. *Id.* And while "[t]he judicial task in assessing evidence of a religious conflict is narrow," the Court must ensure that (1) an asserted conflict is sincerely based on religion "rather than some other motivation," and (2) an asserted belief "actually conflicts with a workplace policy." *Id.* (quoting *Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015)).

Here, MCS argues throughout its summary judgment papers that Dobson's explanation simply cannot constitute a "sincerely held religious belief," as a matter of law.

12

(DE 56 at 17-19) (DE 42 at 27-29.) Rather, MCS suggests that Dobson's conflict with its vaccination policy is premised on her "personal medical judgment" (DE 56 at 19) and a "personal fear of the vaccine," rather than any religious explanation. (DE 42 at 1.) Dobson claims, in contrast, that her conflict with MCS's vaccine policy is premised on her Catholic faith. (DE 43 at Page ID# 649.) Dobson testified that her religious beliefs conflicted with MCS's vaccine policy because she read that researchers used "stem cells from aborted fetal tissue in the testing of the vaccine." (*Id.*) In her eyes, such use of aborted fetal tissue went against the moral code she derives from her Catholic faith. (*Id.*) MCS argues that Dobson's explanation is a thinly veiled attempt to cloak "some other motivation." (*Id.*) To support its position, MCS cites to an expert report. In that report, MCS's expert suggests that Dobson admits to taking drugs to treat her psoriasis and psoriatic arthritis which likely also used stem cells from aborted fetal tissue during research stages. (DE 42 at 28.) In MCS's eyes, this evidence suggests that Dobson does not feel as strongly about the use of "aborted fetal tissue" in drug testing as she has claimed during this litigation. (*Id.*) As a result, MCS contends that the evidence is so one-sided on the "sincerely held belief" issue that it is entitled to judgment as a matter of law.

The Court disagrees with MCS's position. Fatal to MCS's argument is Dobson's deposition testimony. In her deposition, Dobson very clearly and robustly articulates the basis for her religious objection to MCS's vaccine policy. Notable also is what Dobson did not say in her deposition. Dobson did not claim that she believed the COVID-19 vaccine to be "unsafe" or that she just found vaccinations "wrong"—which are typical objections courts find to be secular and thus insufficient to constitute "sincere religious beliefs." *See Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1011 (7th Cir. 2024) ("accommodation requests rooting themselves entirely in safety considerations with no plain and express connection to religion will fall outside of the statute"); *Fallon v. Mercy Cath. Med. Ctr. of Se. Pennsylvania*, 877 F.3d

13

487 (3d Cir. 2017) (belief that taking flu vaccine violated conscience as to what is right and wrong was not a sincere religious belief). Dobson's testimony and MCS's expert report are therefore in clear conflict. And because Dobson's deposition testimony is based on personal observations and experience, it is affirmative evidence the Court must consider for summary judgment purposes. *Anderson*, 477 U.S. at 255. Accordingly, based on the evidence presented to the Court at this stage, there is "a sufficient disagreement" to require the issue of Dobson's sincerely held religious belief to be submitted to a jury. *Anderson*, 477 U.S. at 251-52.

### ii. Whether accommodating Dobson would impose an undue hardship on MCS.

In Dobson's motion for partial summary judgment, she argues that she is entitled to judgment as a matter of law on Count II because MCS cannot carry its burden to prove an undue hardship. In MCS's motion for summary judgment, it argues that its entitled to judgment as a matter of law because accommodating Dobson would impose an undue hardship on MCS's business. For the following reasons, the Court is not convinced by either parties' argument and summary judgment will not be entered for either side.

At this stage of the analysis, MCS "must show that accommodating [Dobson's] religion would impose an undue hardship." *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007). MCS can carry its burden by demonstrating that Dobson's requested accommodation would impose a "substantial" burden "in the context of [its] business." *Groff v. DeJoy*, 600 U.S. 447, 471 (2023). This requires the Court to conduct a case-specific inquiry into whether MCS's alleged burdens "rise to an excessive or unjustifiable level." *Id*. at 469 (cleaned up).

MCS claims accommodating Dobson's disability would cause two hardships. First, MCS incorporates its ADA undue hardship argument regarding the financial implications of Dobson's requested accommodations into Dobson's religious discrimination claim. (DE 42 at 29.) For the same reasons discussed above, however, a genuine dispute of facts exists

regarding whether MCS's asserted financial concerns rise to the level of a "substantial" burden. *Supra* section (II)(a)(ii).

Second, MCS argues that Dobson's requested accommodations would have posed health and safety risks to other MCS employees. (DE 42 at 29.) While true that "Title VII does not require that safety be subordinated to the religious beliefs of an employee," such safety risks are insufficient to constitute an undue hardship in certain cases. *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 521 (6th Cir. 1975). For example, in *Letgeb v. Sark Wire Corporation*, which MCS cites to for support, the plaintiff requested an exemption from a workplace policy requiring COVID-19 testing. No. 2:21-CV-259-RWS, 2022 WL 18777380, at *1 (N.D. Ga. Sept. 21, 2022). There, the employer mandated testing because of an ongoing outbreak of COVID-19 cases within the employer's facility. *Id.* Because of that outbreak, the court found that the plaintiff's requested accommodation to abstain from testing *did* impose an undue hardship on the employer's efforts to maintain workplace safety. *Id.* at 11.

In contrast, here, MCS has not alleged that there was an ongoing COVID-19 outbreak at its facility at the time Dobson requested her accommodation. Rather, MCS argues that accommodating Dobson would have created safety issues because of the increased COVID-19 rates nationwide. (DE 42 at 30.) Additionally, in contrast to *Letgeb*, Dobson did not request to abstain from testing. Instead, Dobson demonstrated her willingness to submit to testing and other precautionary measures by proposing those mitigating activities as a part of her requested accommodation. (DE 37 at 4.) Thus, it cannot be said that accommodating Dobson would have imposed an undue hardship on MCS's ability to maintain workplace safety as a matter of law. As the Sixth Circuit in *Draper* put it, the facts do not demonstrate that safety problems were "the unavoidable by-product of any accommodation to [Dobson's] religious beliefs." *Draper*, 527 F.2d at 522. Instead, the facts before the Court demonstrate a sufficient

15

disagreement exists so as to warrant submission of the undue hardship issue to a jury. Accordingly, neither party is entitled to summary judgment on Count II.

### c. Retaliation

MCS moves for summary judgment on Count III of Dobson's complaint, which charges MCS with retaliation in violation of Title VII, the ADA, and the Kentucky Act. Proceeding under any of those statutes[2], Dobson must show (1) she "engaged in a protected activity," (2) MCS "knew of the exercise of the protected right," (3) MCS "took adverse employment action against," her or subjected her "to severe or pervasive retaliatory harassment," and (4) "there was a causal connection between the protected activity and the adverse employment action or harassment." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 419 (6th Cir. 2021).

Here, for the first element, the only protected activity Dobson claims to have engaged in is requesting an accommodation. (DE 55 at 29.) Requesting an accommodation, however, is not a protected activity recognized by the Sixth Circuit. *Stanley v. ExpressJet Airlines, Inc.*, 808 F. App'x 351, 358 (6th Cir. 2020). Accordingly, MCS is entitled to summary judgment on Count III of Dobson's complaint.

## IV. Conclusion

Based on the foregoing, it is hereby ORDERED that

1. Dobson's motion for partial summary judgment is DENIED (DE 37); and
2. MCS's motion for summary judgment (DE 39) is GRANTED in part and DENIED in part, GRANTED insofar as it is entitled to summary judgment on Count III, and DENIED insofar as it is not entitled to summary judgment on Counts I and II.

---

[2] The Kentucky Act is interpreted consistent with federal law. *Banks*, 610 F. App'x at 526.

This 8th day of November, 2024.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY